# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **GLEN EVERETT HAGA,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:11CV00063 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By:  James P. Jones |
| **COMMISSIONER OF** ) | United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Ginger J. Largen, Morefield & Largen, P.L.C., Abingdon, Virginia for Plaintiff; Nora Koch, Acting Regional Chief Counsel, Region III, Shannon Petty, Assistant Regional Counsel, Rafael Melendez, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Glen Everett Haga filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C.A. §§ 401-433 (West

2011) and 1381-1383f (West 2003 and Supp. 2011).  Jurisdiction of this court exists under 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Haga filed for benefits on October 16, 2008.  He alleged disability beginning January 9, 2005, due to back pain, chronic obstructive pulmonary disease ("COPD"), emphysema, anxiety and panic attacks.  Haga's claims were denied initially and upon reconsideration.  A hearing was held before an administrative law judge ("ALJ") on June 23, 2010, at which Haga, represented by counsel, and an impartial vocational expert, testified.  On July 28, 2010, the ALJ issued a decision that Haga was not disabled.  The Social Security Administration Appeals Council denied Haga's request for review.  Haga then filed a complaint in this court seeking judicial review of the ALJ's decision.

The parties have filed cross motions for summary judgment, which have been briefed and orally argued.  The case is ripe for decision.

II

Haga was born on March 19, 1958, making him a "person approaching advanced age" under the Social Security Regulations.  20 C.F.R. §§ 404.1563, 416.963 (2011).  He has a high school education and past relevant work experience as an electrical assembly set-up mechanic.

Haga presented to Stone Mountain Health Services in March 2005, two months after the onset date alleged for his disability. He gave a history of lower back pain since he had been 21 years old. He reported that his back pain was causing anxiety and panic attacks. He was diagnosed with lower back pain, anxiety and depression and it was recommended that he continue in his course of medication.

Haga returned to Stone Mountain for monthly visits between May and August 2005. At his May 2005 appointment, the provider noted that he had an "unusual affect" that seemed "to be a mix of anger, placation, manipulation, etc." (R. at 236.) He was diagnosed with high blood pressure which was poorly controlled, chronic back pain and possible personality disorder. At his June 2005 appointment, Haga reported he was doing better on his blood pressure (Neurontin) and depression (Prozac) medications and that he believed medication could help him. The doctor noted that he seemed less angry today but that his unusual affect persisted and he spoke incessantly about various issues. The doctor also noted that although Haga suffered from chronic pain, the "nature of back pain [was] not clarified." (R. at 234.) He was diagnosed with high blood pressure, anxiety, depression or post-traumatic stress disorder ("PTSD"). The doctor also questioned whether Haga was exhibiting "drug seeking behavior." (*Id.*) Throughout his

treatment, until October 2005, his presentation and diagnoses remained basically the same. He did not seek any further treatment until 2007.

On February 22, 2007, Haga visited the Department of Veterans' Affairs ("VA") hospital and was seen by a mental health nurse practitioner Rhonda Malina. He complained primarily of severe chronic back pain but stated that he was not currently attempting to get treatment for it. He asked for pain medication, specifically Valium, Xanax or Clonazapam. He stated his anxiety/depression was caused by his back pain. Malina noted that he was "very difficult to understand as he rambles from topic to topic without a pause." (R. at 267.) On exam, Malina observed that he had thoughts with "looseness of associations, flight of ideas and suspiciousness." (R. at 268.) He was not cooperative with the full exam. She also noted that he was much more "clear, articulate, and focused when discussing various side effects of meds he has taken in the past and in describing why he feels I should prescribe meds requested today." (*Id.*) He denied any history of past psychiatric hospitalizations, suicide attempts or current ideations. He reported that he had been referred to a mental health clinic at the VA medical center but had declined to have an appointment. Malina recommended counseling but Haga declined such treatment. After some dispute over which medication would be prescribed, Haga agreed to try Divalproex. He failed to show up for a follow-up appointment.

On March 9, 2007, Haga returned to Stone Mountain for treatment. He was diagnosed with chronic lower back pain, high blood pressure, anxiety with PTSD, and possible COPD, due to ongoing tobacco use. He was started on Lortab for his back pain, restarted on blood pressure medication, and, after it was noted that he was not taking the medication Malina had prescribed, started on Klonopin. Subsequent treatment notes indicate that his exams remained normal and that he repeatedly refused to stop smoking despite being urged to do so. The Klonopin appeared to help his anxiety and depression, though treatment notes indicate he continued to talk incessantly at his appointments and exhibited anger, particularly when confronted about his blood pressure issues. (R. at 219.)  He stopped treatment at Stone Mountain in February 2008.

On February 20, 2009, Haga underwent a consultative examination with psychological examiner Kathy Miller, M.Ed., and psychologist Robert Spangler, Ed.D. Haga was clean and neat but smelled strongly of cigarette smoke. He was socially confident and comfortable and generally understood the instructions for each task. Miller noted that his concentration varied in that it was very poor during conversation (she noted several times that he rambled such that it was difficult to get a complete history out of him) but his concentration improved markedly when he was given a specific task. She also observed that he was appropriately persistent on tasks. He completed the tasks set to him successfully.

Haga gave a number of inconsistent statements during the examination. He claimed he had PTSD from his military service and that he was seeking disability due to PTSD. He could not give any specifics on what caused his PTSD or his symptoms. Miller noted that Haga's VA records did not mention PTSD or any related symptoms. Haga also claimed he had been hospitalized for psychiatric problems, although he had previously denied such hospitalization. He also stated he had been in counseling but the record does not support this assertion.

Miller concluded that Haga had loose associations, low average intelligence, and anxiety. She diagnosed anxiety disorder, NOS, moderate and untreated, low average intellectual functioning, and a global assessment of functioning ("GAF") score of 55, consistent with moderate symptoms.

On March 25, 2009, state agency psychologist, Joseph Leizer, Ph.D. reviewed the evidence and opined that although Haga had moderate limitations in concentration and social functioning, he retained the mental capacity to perform simple, unskilled and non-stressful work.

On March 26, 2009, Haga underwent a physical consultative examination with William Humphries, M.D. He told Dr. Humphries that he had stopped smoking two and a half years earlier, despite having smelled strongly of cigarette smoke in his consultative exam one month earlier. On physical examination, he had a slightly reduced range of motion in his back, normal range of motion in his

shoulders, wrists, knees, ankles and feet.  His straight leg-raising test was negative.  He could walk without a cane and heel/toe walk.  He had clear breath sounds, no rales, wheezes or rhonci.  Dr. Humphries diagnosed severe hypertension, chronic thoracic and lumbar strain, mild COPD and mild degenerative joint disease.  He opined that Haga could perform medium work but be limited to sitting, standing and walking six hours in an eight-hour work day, lifting 50 pounds occasionally and 25 pounds frequently, occasional climbing and kneeling with no crawling.

In April 2009, Donald Williams, M.D., a state agency physician, reviewed the record and opined that Haga could stand and/or walk and sit six hours in an eight-hour workday.  In September 2009, Michael Hartman, M.D., reviewed the record and his conclusions agreed with Dr. Williams' conclusions.

In July 2009, Haga began treatment with Barbara Overbay, M.D.  He appeared anxious but declined a mental health evaluation because his symptoms were due to his low back pain.  He had not taken his medications for some time.  He had a normal gait and appropriate mood and affect.  He did not use or require a cane.  He continued to see Dr. Overbay monthly and reported only situational stressors.  He stated that he walked for exercise and fished.  He declined mental health treatment.  Dr. Overbay observed that an MRI showed degenerative disc disease without stenosis or nerve root compression.

shoulders, wrists, knees, ankles and feet.  His straight leg-raising test was negative.  He could walk without a cane and heel/toe walk.  He had clear breath sounds, no rales, wheezes or rhonci.  Dr. Humphries diagnosed severe hypertension, chronic thoracic and lumbar strain, mild COPD and mild degenerative joint disease.  He opined that Haga could perform medium work but be limited to sitting, standing and walking six hours in an eight-hour work day, lifting 50 pounds occasionally and 25 pounds frequently, occasional climbing and kneeling with no crawling.

In April 2009, Donald Williams, M.D., a state agency physician, reviewed the record and opined that Haga could stand and/or walk and sit six hours in an eight-hour workday.  In September 2009, Michael Hartman, M.D., reviewed the record and his conclusions agreed with Dr. Williams' conclusions.

In July 2009, Haga began treatment with Barbara Overbay, M.D.  He appeared anxious but declined a mental health evaluation because his symptoms were due to his low back pain.  He had not taken his medications for some time.  He had a normal gait and appropriate mood and affect.  He did not use or require a cane.  He continued to see Dr. Overbay monthly and reported only situational stressors.  He stated that he walked for exercise and fished.  He declined mental health treatment.  Dr. Overbay observed that an MRI showed degenerative disc disease without stenosis or nerve root compression.

In September 2009, state agency psychologist Louis Perrott, Ph.D., reviewed Haga's file and concluded that he had only mild to moderate mental limitations. He agreed with Dr. Leizer that Haga would be able to perform simple, unskilled and non-stressful work.

At his hearing before the ALJ, Haga testified on his own behalf. He stated that he lives alone and is able to care for himself, including preparing his own meals. He stated that he experienced sharp pain throughout his entire back that lasts all day and radiates into his right leg. He said that pain medication helps but it lets him down before his next prescribed dose. He said that he was uncomfortable when he sits and likes to be able to get up and move. On an emotional level, he testified that he has good days and bad days but that he generally has four or five good days out of a week.

The vocational expert, responding to hypothetical questions posed by the ALJ, testified that an individual with Haga's education and work experience, who could perform light work with mild to moderate limitations in concentration, persistence and pace, could perform jobs existing in the national economy. If the limitations in concentration, persistence and pace were increased to severe, the vocational expert testified that there were no jobs existing in the national economy. Haga's counsel asked the vocational expert whether a person with mild limitations who also had to move from sitting every 30 minutes would be able to perform the

jobs posited.  The vocational expert responded that it would be difficult and for the most part it would eliminate the jobs.

Following the administrative hearing, the ALJ posed interrogatories to independent medical consultant Charles Cooke, M.D.  Dr. Cooke opined that Haga's impairments did not meet or equal a listed impairment.  Dr. Cooke observed that Haga was not compliant with his hypertension medication, the record contained only one treatment note for wheezing, diagnostic tests showed only mild degenerative disc disease, and examinations were normal.  Based on his review, Dr. Cooke concluded that Haga could perform light work, did not need a cane to ambulate, could continuously use his hands and feet, and could perform a number of activities without assistance.  He stated that Haga could sit/stand/walk for four hours at one time without interruption and for six hours in an eight-hour workday with a sit/stand option.

In his decision, the ALJ found that Haga had the following severe impairments:  degenerative disc disease of the spine, degenerative joint disease of the hands and feet, hypertension, COPD, anxiety, affective disorder, and personality disorder.  The ALJ found that these impairments did not meet or medically equal any of the listed impairments.  The ALJ determined that Haga had the residual functional capacity ("RFC") to perform a range of unskilled light work that did not require exposure to environmental irritants and, based on the

vocational expert's testimony, could perform jobs existing in the national economy and therefore was not disabled.

Haga argues the ALJ's decision is not supported by substantial evidence. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A); 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4) (2011). If it is determined at any point in the five-step analysis that

the claimant is not disabled, the inquiry immediately ceases. *Id*. The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Haga presents several arguments that the ALJ's decision in his case is not supported by substantial evidence.

First, Haga argues that the ALJ erred in accepting the opinion of Dr. Cooke that Haga could perform light work because that opinion was inconsistent with the record.[1]  Haga does not cite any specific instances in which Dr. Cooke's opinion conflicts with other evidence in the record or is otherwise unsupported by the evidence.  The bare assertion of a legal conclusion as argument is hardly sufficient to satisfy Haga's burden to show the ALJ erred in rendering his decision.  *See Ehrisman v. Astrue*, 377 F. App'x 917, 920 (11th Cir. 2010) (unpublished).

Because of the lack of development it is difficult to discern the exact nature of Haga's argument with the ALJ's consideration of Dr. Cooke's opinion.  The ALJ relied upon Dr. Cooke's opinion in addition to all of the other evidence in the record.  The weight given any medical opinion is dependent upon the opinion's support in the record and consistency with the record.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2011).  The ALJ accorded Dr. Cooke's opinion significant weight, noting specifically that it was consistent with the opinions of other medical professionals as well as the medical evidence in the record.  Dr. Cooke's opinion is clearly supported by the record.  Dr. Cooke specifically cites objective medical evidence, including Haga's mild diagnostic findings, his refusal to seek treatment, his noncompliance with medication, the minimal decrease in range of motion, and negative straight leg-raising test, in support of his conclusion

---

[1] Oddly, Haga argues later that the ALJ erred in not considering Dr. Cooke's opinion.

that Haga can perform light work. This opinion is consistent with those of Drs. Humphries, Williams and Hartman. Further, Dr. Cooke's opinion is not inconsistent with the opinions of any of Haga's treating physicians as none of his physicians has imposed any functional limitations or concluded that his limitations precluded work. The ALJ did not err in considering and according great weight to Dr. Cooke's opinion.

Haga next argues that the ALJ failed to evaluate the cumulative effect of all of his impairments. Again, this argument is presented as a legal conclusion without reference to the particular impairments concerned or to any evidence showing how Haga asserts that his cumulative impairments render him disabled. Regardless, the ALJ discussed and considered each impairment asserted by Haga and found that he suffered from severe impairments in addition to those he claimed in his application. The ALJ specifically stated that he had considered the cumulative effect of Haga's impairments at step three of the evaluation and the ALJ's determination of Haga's RFC takes account of each of Haga's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2011) (noting that the RFC describes the most a claimant can do despite the combined effects of his impairments).

Haga then argues that the ALJ erred in not considering all of the vocational expert's testimony, specifically that section of the testimony when, in response to the question posed by Haga's counsel regarding changing position every 30

minutes, the vocational expert stated that such a requirement would effectively rule out all potential jobs.[2]  Presumably, Haga found the 30-minute change in position requirement from Dr. Cooke's statement in his opinion that Haga would need a sit-stand option.  However, that is not an accurate reading of Dr. Cooke's opinion.  Dr. Cooke opined that Haga could sit, stand and walk for four hours at a time without interruption and that he could sit, stand and walk for six hours in an eight-hour day.  The questionnaire then asked:  "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?"  (R. at 372.)  In response to this question, Dr. Cooke wrote, "sit-stand option."  (*Id.*)  This is not the same thing as requiring Haga to have a change of position every 30 minutes and such a requirement directly contradicts Dr. Cooke's opinion that Haga can sit or stand for four hours without interruption.  In fact, there is nothing in the record supporting a requirement that Haga change position every 30 minutes and thus, the ALJ was not required to present it to the vocational expert.  *See Toler v. Chater*, No. 94-1112, 1995 WL 298111, at *3 (4th Cir. May 17, 1995) (unpublished) ("While questions posed to a [vocational expert]

---

[2]  Haga also argues that the ALJ erred in not finding him disabled because he turned 50.  He cites to Social Security Ruling 83-12, claiming that the ALJ should have at least found him disabled as of his 50th birthday.  Ruling 83-12 discusses policies applicable in using the numbered tables (the "Grids") as a framework for adjudicating claims with only exertional limitations.  In this case, because Haga has non-exertional limitations, the ALJ did not reference the Grids but rather used the assistance of a vocational expert.  *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).  Even if Haga did not have non-exertional limitations, application of the Grids to his case would not have resulted in a finding of disabled.

must fairly set out all of the claimant's impairments, the questions need only reflect those impairments supported by the record." (internal quotation marks and citations omitted)).

Haga's final argument is that the ALJ failed to make an "individualized consideration" of his mental impairments. (Pl.'s Brief 9.)  Again, Haga does not discuss this argument beyond the presentation of a legal conclusion or develop it in any way that assists the court in making a determination.  Rather, he simply claims that the ALJ should have made a "deeper examination" of his mental impairments and references his tendency toward incessant talking and anger.  (*Id*. at 10.) Although the record reflects Haga's unusual affect, anger, and incessant and sometimes inappropriate talking, it does not support the conclusion that his mental impairments preclude him from work.  When he was taking his medication, and he often refused to comply with his treatment, it was successful in addressing his issues.  Further, despite his mental impairments, he was able to understand instruction and perform discreet tasks without difficulty.  He also steadfastly refused any kind of counseling or other mental health treatment.

No physician concluded that his mental impairments preclude him from work and rather generally concluded that he had, at the most, moderate limitations. Both state agency psychologists acknowledged his unusual style of interacting but concluded that he was not precluded from simple, unskilled and non-stressful

work.  These opinions comport with the ALJ's determination of his RFC.  *See* 20 C.F.R. §§ 404.1527(f)(2(i), 416.927(f)(2)(i) (2011).

Substantial evidence supports the ALJ's decision that Haga is not disabled.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted.  A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED:   April 10, 2012

/s/  James P. Jones
United States District Judge